IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

THE ALLIANCE FOR TRIBAL CLEAN ENERGY, a 501(c)(3) nonprofit corporation; and CHÉRI SMITH, in her official and individual capacities,

Plaintiffs,

v.

7SKYLINE, LLC, a limited liability company; JENNIFER ROUDA, in her official and individual capacities; and DAVID HARPER, in his official and individual capacities,

Defendants.

3:24-cv-01818-JR

FINDINGS & RECOMMENDATION

RUSSO, Magistrate Judge:

Plaintiffs, The Alliance for Tribal Clean Energy ("Alliance") and Chéri Smith, bring this action alleging misappropriation of trade secrets, among other claims against Defendants 7Skyline, LLC, Jennifer Rouda, and David Harper. Plaintiffs timely filed their second amended complaint ("SAC"), after which defendants filed the present motion to dismiss the claims against them. Defendants also seek to strike the defamation per se claims pursuant to Oregon's Anti-SLAAP statute. For the reasons stated below, defendants' motion is denied.

## ALLEGATIONS

Plaintiffs allege the Alliance for Tribal Clean Energy is a nonprofit with a mission to support Native American Tribes in developing clean energy projects, to reduce poverty, and to mitigate the effects of climate change. SAC (ECF 38) at ¶ 14.

Plaintiffs allege the Alliance "has compiled trade secrets, including without limitation: donor lists; donor names and contact information; arrangements with donors; internal Tribal engagement notes; details relating to the Alliance's relationships with donors and Tribal engagement partners; and other highly confidential information." Id. at ¶ 18. Plaintiffs assert the Alliance "took reasonable measures to maintain the secrecy of these Trade Secrets, which are contained on a password-protected, cloud-based computer drive," and that it "derives independent value from the Trade Secrets not being generally known to, and not readily ascertainable through proper means by other persons who can obtain economic value from the disclosure or use of the Trade Secrets." Id. at ¶¶19-20.

Plaintiffs allege that Alliance employees are prohibited from disclosing any confidential information related to the Alliance during and after their employment, including "proprietary information, donors lists, Tribal information, financial data, and any other sensitive materials." Id. at ¶ 21. Additionally, employees are required to ensure confidential information is not accessible to unauthorized persons by "adding a password to access computers . . . after 10 minutes of inactivity [and] adhere to all company data security and confidentiality policies." Id. Plaintiffs allege, upon termination from the Alliance, employees are required to return all intellectual property without retaining copies. Id. at ¶ 22.

Plaintiffs allege the Alliance hired defendants David Harper and Jennifer Rouda in May and June 2023 respectively. Plaintiffs further state that both Harper and Rouda were required to

abide by the Alliance's confidentiality policies. Id. at ¶ 24-25. As part of their employment, the Alliance provided access to and entrusted Rouda and Harper with its confidential information. Id. at ¶ 26.

Plaintiffs assert the Alliance CEO, Chéri Smith, became aware in early 2024 that defendants Rouda and Harper were engaged in "ongoing and escalating instances of self-dealing, conflicts of interest in their personal affairs, and other professional misconduct." Id. at ¶ 27. Plaintiffs allege on April 16, 2024, Smith and the Alliance's CFO and HR representative informed Rouda and Harper that it was in all parties' best interest to end the employment relationship "in light of the evidence of self-dealing, conflicts of interest, and professional misconduct." Id. at ¶ 28. Rouda and Harper resigned on April 19, 2024. Id.

Plaintiffs assert that shortly after the April 16, 2024 meeting, defendants Rouda and Harper "started misappropriating the Alliance's Trade Secrets in one or more of the following ways: deleting, copying, downloading, retaining, disclosing, making public, and/or using the Alliance's Trade Secrets and other confidential information on the organization's password-protected, cloud-based drive, without the Alliance's consent or authorization," despite the contractual and common law obligations not to do so. Id. at ¶ 29.

Plaintiffs allege defendants:

> breached their duty of loyalty and other contractual or common law obligations to the Alliance by acting for their own benefit or other third parties' benefit, rather than the Alliance's benefit. While still employed by the Alliance, Defendants used the Alliance's property, equipment, and resources without authorization for their own benefit, in connection with their business, 7Skyline, LLC, or for the benefit of third parties. In addition, around that time, Defendants started disclosing or using such information in connection with Defendants Rouda's and Harper's own business, and/or in connection with Tribes and other third parties. Finally, while still employed by the Alliance and thereafter, Defendants started soliciting or attempting to solicit multiple employees and consultants of the Alliance; and in fact, at least three employees and one consultant left the Alliance and went to work for 7Skyline, LLC.

Id. at ¶ 30.

Plaintiffs further allege defendant Rouda, after departing, intentionally interfered with the Alliance's economic relationships with prospective donors, and specifically allege, as an example:

> at some point between April 19, 2024, and July 17, 2024, Defendant Rouda, upon information and belief, contacted the Alliance's prospective donor, the Schmidt Family Foundation's 11th Hour Project, in an attempt to interfere with the Alliance's unrestricted grant award. Previously, the 11th Hour Project had informed the Alliance that this unrestricted grant was forthcoming. However, on July 17, 2024, the 11th Hour Project suddenly and suspiciously rescinded the Alliance's $400,000 unrestricted grant award, representing it was "left with questions [it] would need to address," which would have required it to "conduct deeper due diligence including … interviews with … [the Alliance's] former staff."

Id. at ¶ 31.

Plaintiffs further allege defendant Rouda, after departing, intentionally interfered with the Alliance's economic relationships with Tribes and other third parties, and specifically allege, as an example:

> beginning in or around August 3, 2024, Defendant Rouda wrote to a representative from Colusa Indian Energy—a Tribally owned corporation wholly owned by the Colusa Indian Community that has an economic relationship with the Alliance—and represented that she could provide Colusa Indian Energy with access to the Alliance's existing or prospective donors, including access to the Lemelson Foundation, Salesforce Foundation, and the MacArthur Foundation. Defendant Rouda started introducing that Tribal representative to at least one of the Alliance's donors, the Salesforce Foundation, apparently in hopes that Defendant Rouda could move donor money away from Alliance and into the Tribe's nonprofit. In doing so, Defendant Rouda apparently aimed to inflict injury on the Alliance and CEO Smith by moving money away from the Alliance, texting: "Considering what could come out about [CEO Smith] [Colusa Indian Energy's] program might be a really nice back up plan for" the Salesforce Foundation and the MacArthur's Foundation, i.e., the Alliance's existing and prospective donors.

Id. at ¶ 32.

In addition, plaintiffs assert defendant Rouda made:

> untrue, defamatory statements, orally and in writing, to third parties, including without limitation to the Alliance's Tribal partners, donors, other Tribes or Tribal

> entities, and other third parties, and/or their agents, by falsely stating, among other things, that the Alliance was committing purported financial mismanagement of donor and/or Tribal funds and that CEO Smith, a descendant of the Mi'Kmaq of Northern Maine and the Canadian Maritimes, is a "Pretendian" (i.e., "Pretend Indian") and/or has no Native ancestry or heritage.

Id. at ¶ 33.

Plaintiffs specifically allege defendant Rouda made the false statements to a representative from Colusa Indian Energy suggesting CEO Smith should be outed as non-Native and that donor funds were being inappropriately used on events, trips, and/or not being funneled to Tribes.[1] Id. at ¶ 34. Plaintiffs further specifically allege defendants contacted:

> the Alliance's existing or prospective donors—including without limitation the Lemelson Foundation, the Schmidt Family Foundation's 11th Hour Project, the Salesforce Foundation, the MacArthur Foundation, and the Energy Foundation--in an apparent attempt to interfere with the economic relationship between these foundations and the Alliance. Specifically, Defendant Rouda admits that she attempted and/or continues to attempt to (1) solicit the Alliance's existing or prospective donors and foundations to sponsor or participate in 7Skylin-related events, (2) persuade these donors to donate to Tribes or other third parties instead of the Alliance, and (3) persuade these donors to end their economic relationship with the Alliance.

Id. at ¶ 35.

Plaintiffs allege that defendant Rouda made false and defamatory statements to key nonprofit partners, and specifically in September 2024:

> two representatives of one of the Alliance's key nonprofit partners, GRID Alternatives, requested a meeting with the Alliance's Head of Policy to discuss an "important matter." During that meeting, the GRID Alternatives representatives asked the Alliance's Head of Policy to respond to Defendant Rouda's allegations against the Alliance—that the Alliance had purportedly mistreated Native women who were solicited away from the Alliance to Defendant Rouda's business, that the Alliance was mismanaging donor funds, and that CEO Smith had no Native ancestry. Although the Alliance's Head of Policy explained the truth, the Alliance has never repaired its relationship with GRID Alternatives due to Defendant Rouda's slander and disparagement. On or around November 18, 2024, at a

[1] Plaintiffs allege the "identified expenditures are entirely consistent with the Alliance's mission to provide in-person support, events, and education for the benefit of the Alliance's Tribal partners." SAC (ECF 38) at ¶ 34.

> Department of Energy Program Review event, a GRID Alternative representative repeated Defendant Rouda's lie that CEO Smith is a "Pretendian."

Id. at ¶ 36.

Plaintiffs allege that defendant Rouda contacted the Alliance's prospective Tribal partners to interfere with and/or destroy the Alliance's working relationship with these Tribes by making false statements about the Alliance's financial management and CEO Smith's race. Plaintiffs allege, specifically that:

> [l]eading up to Defendant Rouda's departure from the Alliance, the Alliance was working with the Penobscot Tribe and the University of Maine, but that relationship quickly deteriorated after Defendant Rouda started contacting the Alliance's Tribal partners in 2024. Now, 7Skyline is hosting events with these Tribes, called "Power Up: Tribal Energy Symposium with the Wabanaki Tribes of Maine." In late May 2025, CEO Smith was also informed that a member of the Passamaquoddy Tribe was warning individuals in the energy community that CEO Smith was a "Pretendian."

Id. at ¶ 37.

Plaintiffs allege defendant Rouda, in December 2024, emailed the Executive Director of the Lemelson Foundation to solicit it as a sponsor for or participant in an event hosted by her business, 7Skyline, LLC. Id. at ¶ 38. Plaintiffs allege this communication was defendant Rouda's deliberate attempt to "inflict injury on the Alliance and CEO Smith by moving donor money away from the Alliance and to her own business or other third parties." Id.

Plaintiffs allege that defendants' actions led to the Alliance's loss of at least one prospective grant in the amount of $400,000. Id. at ¶ 40. Plaintiffs allege further injury as a result of defendants' attempts to "solicit the Alliance's then employees, consultants, and other personnel, including successfully soliciting three employees and one consultant who left the Alliance and now work for 7Skyline, LLC. Id. at ¶ 41. Plaintiffs allege they have "suffered irreparable harm to their reputation" in the relevant communities. Id. at ¶ 42. Furthermore, CEO Smith alleges "having

to defend her ancestry and leadership of the Alliance has caused her emotional distress and harm, such as mental anguish, humiliation, loss of self-esteem, and dignity." Id. at ¶ 43.

Plaintiffs allege five causes of action: (1) misappropriation of trade secrets under the Defend Trade Secrets Act (DTSA), 18 U.S.C. § 1836 against all defendants; (2) misappropriation of trade secrets under the Oregon Uniform Trade Secrets Act (OUTSA), Or. Rev. Stat. § 646.461 *et seq.* against all defendants; (3) tortious interference with contract or business relationships against defendant Rouda; (4) defamation per se against defendant Rouda; and (5) breach of loyalty against defendants Rouda and Harper. Defendants move to dismiss all claims under Rule 12(b)(6) of the Federal Rules of Civil Procedure and move to strike the defamation per se claim under Oregon's Anti-SLAAP statute, Or. Rev. Stat. § 31.150.

## STANDARD OF REVIEW

On a Rule 12(b)(6) motion to dismiss for failure to state a claim, the complaint is construed in the light most favorable to the non-moving party, and all material allegations in the complaint are taken to be true. Sanders v. Kennedy, 794 F.2d 478, 481 (9th Cir.1986); see Fed.R.Civ.P. 12(b)(6). A complaint does not need detailed factual allegations to survive a 12(b)(6) motion, but plaintiffs must provide grounds demonstrating their entitlement to relief. Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007). The complaint, therefore, must contains sufficient facts to allow the court to draw a reasonable inference that the defendant is liable for the alleged misconduct. *Iqbal,* 556 U.S. at 678.

## DISCUSSION

### A. Misappropriation of Trade Secrets

To state a claim for misappropriation of trade secrets under the DTSA a plaintiff must plead "(1) that the plaintiff possessed a trade secret, (2) that the defendant misappropriated the trade

secret; and (3) that the misappropriation caused or threatened damage to the plaintiff." InteliClear, LLC v. ETC Global Holdings, Inc., 978 F.3d 653, 657–58 (9th Cir. 2020); 18 U.S.C § 1839(5). To state a claim for misappropriation of trade secrets under the OUTSA, a plaintiff must allege: "(1) the subject of the claim qualifies as a statutory trade secret; (2) plaintiff employed reasonable measures to maintain the secrecy of its trade secrets; and (3) the conduct of the defendants constitutes statutory misappropriation." Vesta Corp. v. Amdocs Mgmt. Ltd., 2018 WL 4354301, at *14 (D. Or. Sept. 12, 2018) (citing Acrymed, Inc. v. Convatec, 317 F. Supp. 2d 1204, 1218 (D. Or. 2004)).

The DTSA and state law trade secret misappropriation claims are considered together when the elements and definitions in the two statutory schemes overlap. See InteliClear, 978 F.3d at 657 (considering California Uniform Trade Secrets Act and DTSA claims together); See DropzoneMS, LLC v. Cockayne, 2019 WL 7630788, at *9 (D. Or. Sept. 12, 2019) ("Both the DTSA and the [OUTSA] define the terms 'improper means,' 'misappropriation,' and 'trade-secret,' and while they define the terms differently, the differences do not appear to be substantive.") As the parties both discuss the DTSA and OUTSA claims together in their briefing, the Court does as well.

Under the DTSA, a "trade secret" is defined as information that "the owner thereof has taken reasonable measures to keep secret; and the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or information." 18 U.S.C § 1839(3). Under the OUTSA, a "trade secret" is similarly defined as "information ... that derives independent economic value, actual or potential, from not being generally known to the public or to other persons who can obtain economic value from its disclosure or use; and is the subject of efforts that are reasonable under the circumstances to

maintain its secrecy." Or. Rev. Stat. § 646.461(4).

Trade secrets frequently contain elements that by themselves may be in the public domain but together qualify as trade secrets. Buffets, Inc. v. Klinke, 73 F.3d 965, 968 (9th Cir. 1996). Accordingly, a customer list can sometimes be a trade secret, such as when the employer has expended considerable time and money to pinpoint a narrow segment of the population that is interested in this product or service. IKON Off. Sols., Inc. v. Am. Off. Prods., Inc., 178 F. Supp. 2d 1154, 1167 (D. Or. 2001), aff'd, 61 F. App'x 378 (9th Cir. 2003). A plaintiff seeking relief for misappropriation of trade secrets must identify the trade secrets by describing the subject matter of the trade secret with sufficient particularity to separate it from matters of general knowledge in the trade or of special knowledge of those persons skilled in the trade. Imax Corp. v. Cinema Techs., Inc., 152 F.3d 1161, 1164–65 (9th Cir. 1998).

As noted above, plaintiffs assert the alleged trade secrets consist of donor lists; donor names and contact information; arrangements with donors; internal Tribal engagement notes; details relating to the Alliance's relationships with donors and Tribal engagement partners; and other highly confidential information. SAC (ECF 38) at ¶ 18. Plaintiffs allege they took measures to maintain the secrecy of the lists as they were derived over a long period of time and at considerable expense. Id. at ¶ 19. Defendants assert the allegations offer inadequate information as to what alleged trade secrets are at issue. However, plaintiffs need not spell out the details of the trade secrets to survive a motion to dismiss, as requiring plaintiffs to disclose such details in their complaint would effectively destroy the very trade secrets that they seek to protect. Autodesk, Inc. v. ZWCAD Software Co., 2015 WL 2265479, at *4 (N.D. Cal. May 13, 2015). Rather, plaintiffs need only describe the subject matter of the trade secret with sufficient particularity to separate it from matters of general knowledge in the trade or of special persons who are skilled in

the trade, and to permit the defendants to ascertain at least the boundaries within which the secret lies. Sennco Sols., Inc. v. Mobile Techs., Inc., 2021 WL 463436, at *2 (D. Or. Feb. 9, 2021).

Defendants suggest the alleged trade secrets are comprised of “vague and general categories” that amount to little more than a misappropriated customer list. (ECF 41, at 7-8). While it is true that customer lists, customer identity, customer contact information and confidential information about each customer's business, purchase and credit information has been held inadequate to allow a defendant to understand what the information was in fact secret, see Vesta Corp. v. Amdocs Mgmt. Ltd., 80 F. Supp. 3d 1152, 1164 (D. Or. 2015), here plaintiffs allege it has developed its lists over a long period of time and at substantial expense. See Ikon Office Solutions, 178 F.Supp.2d at 1167 (customer list can be a trade secret "when the employer has expended considerable time and money to pinpoint a narrow segment of the population that is interested in this product or service.") There is no suggestion from the complaint that the list is comprised of a narrow market of easily ascertainable donors or commonly known donors and their information. See id. at 1168 (customer list not a trade secret if principal customers are easily identifiable or commonly known). As such, the question of whether certain information constitutes a trade secret is best resolved by a fact finder after full presentation of evidence from each side. Kaib's Roving R.PH. Agency, Inc. v. Smith, 237 Or. App. 96, 103, 239 P.3d 247, 250 (2010).

Defendants next assert plaintiffs fail to allege factual statements as to their efforts to protect the alleged trade secrets. As noted above, plaintiffs allege new employees must agree not to disclose confidential information including donor lists, and to take affirmative steps to ensure such information is inaccessible to unauthorized persons. Moreover, plaintiffs allege that, upon termination, an employee must return all confidential information and not retain any copies or notes regarding confidential information. In addition, plaintiffs allege they maintain their donor

lists and information on a password-protected, cloud-based computer drive. The SAC plausibly alleges that plaintiffs made reasonable efforts to protect their alleged trade secrets and that defendants knew or had reason to know the information was secret. See, e.g., Valmarc Corp. v. Nike, Inc., 2022 WL 2315071, at *3 (D. Or. June 28, 2022) (maintaining information on password protected computer systems, even absent a non-disclosure agreement is sufficient to imply the information is confidential)[2]; see also Carr v. AutoNation, Inc., 798 F. App'x 129, 130 (9th Cir. 2020) (an implied duty of confidentiality exists when the other party has reason to know the information was confidential).

Defendants next assert plaintiffs fail to allege how the information within the alleged trade secrets derives independent economic value for the Alliance. Plaintiffs in their SAC allege the Alliance has compiled a list of reliable contact persons at partner and donor organizations, detailed notes about the relationships with Tribal partners and donors, and detailed notes regarding funding availability and grant opportunities. Plaintiffs have thus plausibly alleged they derive independent economic value from the alleged trade secrets. See e.g., Naegeli Reporting Corp. v. Petersen, 2011 WL 11785484, at *5 (D. Or. Dec. 5, 2011) (finding a list of "reliable, well-qualified, and recommended" contacts that "has been honed over several years and is not publicly available" may have independent economic value as a trade secret).

Defendants next argue that plaintiffs fail to allege any specific acts attributable to a specific defendant demonstrating how the alleged trade secrets were misappropriated. Under the DTSA "misappropriation" means the "acquisition of a trade secret of another by a person who knows or

[2] Defendants argue the complaint is silent as to whether defendants Rouda and Harper executed the employment agreement. However, the complaint alleges the Alliance "requires" new employees to sign an employment agreement including the requirement not to disclose confidential donor information. The complaint plausibly alleges execution of the agreement by defendants Rouda and Harper upon becoming new employees. Moreover, as noted above, the password protected files are sufficient to allege the element of maintaining the secrecy of the information.

has reason to know that the trade secret was acquired by improper means." 18 U.S.C § 1839(5). The OUTSA defines "misappropriation" as "[d]isclosure or use of a trade secret of another without express or implied consent by a person, who at the time of disclosure or use, knew or had reason to know that the knowledge of the trade secret was ... [a]cquired under circumstances giving rise to a duty to maintain its secrecy or limit its use[.]" Or. Rev. Stat. § 646.461(2)(d)(B). Plaintiffs assert the alleged misappropriation began on April 16, 2024, three days before defendants' termination became effective on April 19, 2024. Plaintiffs further allege that during that period, defendants Rouda and Harper deleted, copied, downloaded, retained, disclosed, made public, and/or used the Alliance's trade secrets and other confidential information without the Alliance's consent or authorization. Plaintiffs further allege that defendants disclosed the trade secrets to others who may derive economic value from it to the detriment of the Alliance, including to representatives from Colusa Tribal Energy, and defendants' business, 7Skyline, LLC.

Plaintiffs have sufficiently alleged defendants Rouda and Harper retained and disclosed trade secrets without consent and contrary to their employment agreements. At the pleading stage, "the issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." Gilligan v. Jamco Dev. Corp., 108 F.3d 246, 249 (9th Cir. 1997). The motion to dismiss the misappropriation of trade secrets claims is therefore denied.

B. Intentional Interference with Economic Relationships.

To state a claim for intentional interference with economic relations, plaintiffs must allege: (1) the existence of a professional or business relationship; (2) intentional interference with that relationship; (3) by a third party; (4) accomplished through improper means or for an improper purpose; (5) a causal effect between the interference and damage to the economic relations; and (6) damages. Silliman v. Hawes Fin. Grp., Inc., 2015 WL 5056353, at *3 (D. Or. Aug. 26, 2015).

As noted above, plaintiffs allege defendant Rouda intentionally interfered with the Alliance's economic relationships by, for example, writing to a representative of Colusa Indian Tribal Energy asserting that Rouda could provide the representative with access to the Alliance's donors, making defamatory statements to the Alliance's donors, such as the Schmidt Family Foundation 11th Hour Project, and soliciting those donors away from the Alliance. Plaintiffs allege damages resulted due to, among other things, the loss of prospective grants. Plaintiffs also allege defendants directly solicited the Alliance's employees to leave the Alliance to work for 7Skyline, LLC.

Defendant Rouda contends plaintiffs fail to allege defendant knew of the supposed business relationships in question and thus fail to allege intentional interference. However, the allegations are sufficient to allege a relationship with partners and donors such as the Schmidt Family Foundation 11th Hour Project. Moreover, the complaint plausibly alleges defendant Rouda had access to confidential details such as donor and partner information and copied and retained such information.

Defendant Rouda asserts that plaintiffs fail to connect Rouda’s alleged actions with an improper purpose or improper means. Improper means “must be some independently wrongful act such as “violence, threats, intimidation, deceit, misrepresentation, bribery, unfounded litigation, defamation and disparaging falsehood.” Conklin v. Karban Rock, Inc., 94 Or. App. 593, 601, 767 P.2d 444, 448 (1989). Here, plaintiffs have alleged defendant Rouda used improper means to interfere with the Alliance’s business relationships, including disclosing misappropriated trade secrets and other confidential information to third parties and making defamatory statements.

Plaintiffs' allegations of improper means are plausible as to defendant Rouda.[3]

Defendant Rouda contends the second amended complaint fails to allege a causal relationship between the alleged interference and any economic damage. The complaint identifies one grant, valued at $400,000 which was canceled subsequent to defendant Rouda's departure from Alliance's employment. Plaintiffs further allege that the Alliance has suffered and will continue to suffer actual damages as a result of defendant Rouda's "interference with the Alliance's economic relationships with employees, consultants or other personnel, including the successful solicitation of three employees and one consultant who left the Alliance and now work for 7Skyline, LLC." Such allegations are sufficient to allege damages at the pleadings stage. See Insight Global, LLC v. Tessar, 2019 WL 2488717, at *7 (D. Or. Mar. 20, 2019) (plaintiff's contention that it "has been damaged by loss of business opportunities and revenue diverted … by the actions of the former employees" sufficiently alleged damages at the pleadings stage); Rentokil Initial (1896) Ltd. V. Jeld-Wen, Inc., 2013 WL 869518, at *5 (D. Or. Mar. 6, 2013) (at the pleading stage, allegations of economic interference with property was sufficient to survive a motion to dismiss). As such, defendant Rouda's motion to dismiss the tortious interference claim is denied.

[3] Defendant argues that her actions are protected under Oregon's "business competitor's privilege." See Insight Glob., LLC v. Tessar, 2019 WL 2488717, at *3 (D. Or. Mar. 20, 2019) (businesses acting to further their own legitimate business interests may be entitled to business competitor's privilege). In considering a Rule 12(b)(6) motion to dismiss, however, the Court is bound to consider only such evidence or arguments contained within the four corners of the complaint. Morely v. Smith, 309 Fed.Appx. 103, 106 (9th Cir. 2009). Defendant Rouda's invocation of business competitor's privilege is thus inappropriate at this stage. Moreover, while business competitor's privilege conveys some protection to parties seeking to garner favor away from their competition, that privilege is not without limits. The Restatement (Second) of Torts § 768(1)(b) clarifies that a competitor should be allowed to engage in conduct which seeks to divert business from competitors, provided the competitor *does not use improper means in pursuit of this goal* (emphasis added). As noted above, plaintiffs assert that defendant Rouda employed improper means in their tortious interference claim. Thus, even if the Court were to consider defendant Rouda's business competitor's privilege argument at this stage, it would still fail because plaintiffs have adequately pleaded improper means in their tortious interference claim.

C. Defamation Per Se

To establish a claim for defamation, plaintiffs must show that defendant made a defamatory statement about plaintiffs and published the statement to a third party. Wallulis v. Dymowski, 323 Or. 337, 342-43, 918 P.2d 755 (1996). A defamatory statement is one that would subject plaintiffs to hatred, contempt or ridicule or tend to diminish the esteem, respect, goodwill or confidence in which plaintiffs are held or to excite adverse, derogatory or unpleasant feelings or opinions against plaintiffs. Farnsworth v. Hyde, 266 Or. 236, 238, 512 P.2d 1003 (1973). Spoken words are actionable per se in Oregon if the words tend to "injure the plaintiff in his or her profession or business," or "impute to plaintiff the commission of a crime involving moral turpitude." Marleau v. Truck Ins. Exch., 333 Or. 82, 95, 37 P.3d 148, 155 (2001). In the professional context, a statement is defamatory if it falsely ascribes to another, characteristics or a condition incompatible with the proper conduct of his lawful business, trade, or profession. Brown v. Gatti, 341 Or. 452, 458, 145 P.3d 130 (2006). In this context, defamation by written or printed words is actionable without proof of any special harm. Dossett v. Ho-Chunk, Inc., 472 F. Supp. 3d 900, 910 (D. Or. 2020).

Plaintiffs allege defendant Rouda falsely stated to Tribes and Tribal entities and other third parties that the Alliance has committed financial mismanagement of donor and/or Tribal funds, that plaintiff CEO Smith was a "Pretendian," and that CEO Smith does not have Native ancestry or heritage. SAC (ECF 38) ¶ 77.

With respect to the mismanagement of funds, the complaint alleges that statements of financial mismanagement are untrue and constitute defamation per se because such allegations, if true, constitute a crime or immoral conduct and tend to injure the Alliance and CEO Smith in their profession or business. Plaintiffs allege statements of financial mismanagement were made by

defendant Rouda both orally and via text message to tribal partners, including Colusa Indian Energy representatives, and key nonprofit partners, including representatives from GRID Alternatives. SAC (ECF 38) at ¶¶ 32-34. However, the SAC, provides scant details as to what exactly was said and to whom.[4] Plaintiffs have, nevertheless, plausibly alleged defamation per se regarding statements made by defendant concerning CEO Smith's heritage. Plaintiffs' allegations include evidence that defendant Rouda told Tribal, and donor partners that CEO Smith does not have Native ancestry or heritage and is a "pretend Indian." See e.g., SAC (ECF 38-2 at 9) (asking for support to redirect funding to "actual [N]ative lead organizations"). In this context, where a nonprofit organization relies on connections with Tribal organizations as part of its mission, allegations of company leadership pretending to have Native ancestry could plausibly have negative repercussions among donors and Tribal partners alike. See, e.g., Robillard v. Opal Labs, Inc., 337 F.Supp.3d 962, 970 (D. Or. 2018) (noting statements that are "likely to lead people to question [a] plaintiff's fitness to perform his job, that cast aspersions on the plaintiff's ability to perform essential [job] functions, [and] that assert that the plaintiff lacks a characteristic necessary to successful performance[ ] of his or her job" can be defamation per se) (quoting Herrera v. C & M Victor Co., 265 Or. App. 689, 701, 337 P.3d 154, 161 (2014)). The motion to dismiss this claim is thus denied.

D. Breach of Duty of Loyalty

An employee, as an agent of their employer, owes a duty of loyalty to the principal-employer. See Synectic Ventures I, LLC v. EVI Corp.,353 Or. 62, 72, 294 P.3d 478, 484 (2012). An employee is precluded from actively competing with this employer during the period of

[4] A single text message stating "Considering what could come out about [CEO Smith]" may imply some communication regarding possibly damning information has been shared, but there is no indication if this information involves financial mismanagement. See ECF 38-2.

employment. E*Trade Fin. Corp. v. Eaton, 305 F. Supp. 3d 1029, 1032 (D. Ariz. 2018). But an employee only carries a duty of loyalty so long as the employee remains employed by the company. In other words, an employee's duty of loyalty to their employer ends upon termination of employment. Aitkin v. USI Ins. Servs., LLC, 607 F. Supp. 3d 1126, 1150 (D. Or. 2022).

To plead a breach of fiduciary duty, the plaintiff must allege: (1) the existence of a fiduciary relationship between the parties; (2) a breach of one or more of the fiduciary duties arising out of that relationship; and (3) damage to the plaintiff resulting from a breach of one or more of those duties. Element Materials Tech. Food US LLC v. Kahl, 2020 WL 798156, at *4 (D. Or. Feb. 18, 2020).

Plaintiffs allege that after defendants Rouda and Harper were notified of their terminations, but three days before the terminations became effective, they deleted, copied, retained, and made public the Alliance's trade secrets and other confidential information. Plaintiffs further allege defendants used the Alliance's resources to benefit their business, 7Skyline, LLC, and other third parties. Plaintiffs further allege defendants solicited multiple employees and consultants of the Alliance, ultimately taking three employees and one consultant to work with 7Skyline, LLC. Although plaintiffs' allegations are thin and borderline conclusory, the allegation that defendants successfully solicited three Alliance employees while still employed by the Alliance is sufficient to allege a breach of the duty of loyalty. See Alexander & Alexander Benefits Servs., Inc. v. Benefit Brokers & Consultants, Inc., 756 F. Supp. 1408, 1412 (D. Or. 1991) (employee of plaintiff committed breach of fiduciary duty when, while still employed by plaintiff, he encouraged other employees to join him). The motion to dismiss this claim is denied.

E. OUTSA Preemption

The OUTSA supersedes "conflicting tort, restitution or other laws of Oregon providing

civil remedies for misappropriation of a trade secret." O.R.S. 646.473(1). Where the essence of the claim relates primarily to the alleged misappropriation of a trade secret, the claim is displaced by the preemptive language of the Act. Acrymed, Inc. v. Convatec, 317 F. Supp. 2d 1204, 1217 (D. Or. 2004).

Defendants assert plaintiffs' claims of intentional interference with economic relationships and breach of the duty of loyalty are preempted by their OUTSA claim. Plaintiffs in their SAC argue their claims rely on facts that are not dependent on the misappropriation of trade secrets and are thus not preempted under OUTSA. Specifically, plaintiffs assert both claims rely on the wrongful solicitation of employees and defamation. Again, construing the SAC in a light most favorable to plaintiffs, both the interference with economic relationships and breach of the duty of loyalty claims survive based on the allegations of defamation and that defendants solicited away three former employees of the Alliance in the last three days of their employment with the Alliance. Accordingly, these claims do not primarily rely on the allegations of misappropriation of trade secrets and are not preempted by the OUTSA.

F. Anti-SLAPP

Defendants assert plaintiffs' defamation claim should be struck pursuant to Oregon's Anti-SLAPP statute, Or. Rev. Stat. § 31.150, because it's based on defendants' engagement in First Amendment Activity.

Oregon's anti-SLAPP statute, Or. Rev. Stat. § 31.150, "creates an expedited procedure for dismissal of certain non-meritorious civil cases without prejudice at the pleading stage." Neumann v. Liles, 358 Or. 706, 723 (2016). Application of Oregon's anti-SLAPP statute is a "two-step burden-shifting process." Wingard v. Or. Family Council, Inc., 290 Or. App. 518, 521 (2018). The moving defendant must first demonstrate that "the claim against which the motion is made arises

out of statements or conduct protected by Or. Rev. Stat. § 31.150(2). This statute protects, in relevant part, "any … written statement submitted … in a … proceeding authorized by law," "[a]ny oral statement made, or written statement or other document submitted, in connection with an issue under consideration or review by a legislative, executive or judicial body or other proceeding authorized by law," and "[a]ny other conduct in furtherance of the exercise of the ... constitutional right of free speech in connection with a public issue or an issue of public interest." Or. Rev. Stat. § 31.150(2)(a)(b)(d).

If defendant meets this burden, plaintiff must "establish that there is a probability that [he] will prevail on the claim by presenting substantial evidence to support a prima facie case." Or. Rev. Stat. § 31.150(3). Substantial evidence means enough evidence from which a reasonable trier of fact could find that the plaintiff has met his burden of production. See Handy v. Lane Cty., 360 Or. 605, 623 (2016) ("In using terms like 'probability' and 'substantial evidence,' the legislature did not intend to require a plaintiff to do more than meet its burden of production.").

The second step of the analysis is not constrained to the pleadings. See Bryant v. Recall for Lowell's Future Comm., 286 Or. App. 691, 693 (2017) (considering "facts as provided in the pleadings and the supporting and opposing declarations and exhibits submitted"); see also Or. Rev. Stat. § 31.150(4) ("[T]he court shall consider pleadings and supporting and opposing affidavits stating the facts upon which the liability or defense is based."). When presented with conflicting evidence, courts "adopt the version that is most favorable to plaintiff, so long as it is supported by substantial evidence." Plotkin v. State Accident Ins. Fund, 280 Or. App. 812, 816 (2016) (citation omitted). Courts consider a defendant's opposing evidence "only to determine if it defeats plaintiff's showing as a matter of law." Bryant, 286 Or. App. at 693 (citation omitted).

Defendants assert tribal sovereignty, economic independence, and ancestry are issues of

public interest. Accordingly, defendants argue the alleged defamatory statements regarding mismanagement of tribal funds and lack of Tribal membership are protected by the Anti-SLAPP statute. However, although defendants focus on the importance of a Tribe's right to define its own membership and promote Tribal economic independence, defendants fail to connect whether purported false statements about an individual's heritage or ancestry made to third parties related to personal business interest qualifies as a matter of public concern. No caselaw cited by defendants supports such a proposition. Moreover, even if such statements related to matters of public concern, they were not made in a public forum. Accordingly, defendants fail to meet their burden of demonstrating conduct in furtherance of the exercise of the constitutional right of free speech in connection with a public issue or an issue of public interest. See Dossett v. Ho-Chunk, Inc., 472 F. Supp. 3d 900, 908–09 (D. Or. 2020) (noting that even though comments may themselves be worthy of public interest, they do not qualify for Ant-SLAPP protection when made to a small audience or don't involve a large organization). The record before the Court does not demonstrate whether purported financial mismanagement or ancestry issues impact a large audience or was simply of interest to the speaker and the representative of Colusa Indian Energy. The special motion to strike is denied.

Both parties seek fees related to the Anti-SLAPP motion. Under Or. Rev. Stat. § 31.152(3), if the Court finds that a special motion to strike is frivolous or is solely intended to cause unnecessary delay, the Court shall award costs and reasonable attorney fees to a plaintiff who prevails on a special motion to strike. Defendants' motion is not frivolous because although the complaint involves only private statements, defendants reasonably argued the purported defamatory statements involved matters of potential public interest concerning Tribal autonomy and economic independence. Furthermore, there is no indication the motion was filed to cause

unnecessary delay. Therefore, the Court declines to award fees related to the motion.

## CONCLUSION

Defendants' motion to dismiss and strike (ECF 41) should be denied.

This recommendation is not an order that is immediately appealable to the Ninth Circuit Court of appeals. Any notice of appeal pursuant to Rule 4(a)(1), Federal Rules of Appellate Procedure, should not be filed until entry of the district court's judgment or appealable order. The parties shall have fourteen (14) days from the date of service of a copy of this recommendation within which to file specific written objections with the court. Thereafter, the parties shall have fourteen (14) days within which to file a response to the objections. Failure to timely file objections to any factual determination of the Magistrate Judge will be considered as a waiver of a party's right to de novo consideration of the factual issues and will constitute a waiver of a party's right to appellate review of the findings of fact in an order or judgment entered pursuant to this recommendation.

DATED this 16th day of September, 2025.

/s/ Jolie A. Russo
Jolie A. Russo
United States Magistrate Judge